

# In the
# Missouri Court of Appeals
## Western District

STATE OF MISSOURI,

          Respondent,

v.

MICHAEL LEWIS GIBBONS,

          Appellant.

WD83152

OPINION FILED:

June 29, 2021

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable Jack Richard Grate, Judge**

**Before Division One:**
**Anthony Rex Gabbert, P.J., Edward R. Ardini, Jr., and Thomas N. Chapman, JJ.**

Michael Gibbons appeals his convictions, following a jury trial, for two counts of statutory sodomy in the first degree and two counts of child molestation in the first degree and sentences of ten years' imprisonment for each count of statutory sodomy and five years' imprisonment for each count of child molestation, with the ten-year sentences to run consecutively to each other, and the five-year sentences to run concurrently with the ten-year sentences. Gibbons raises nine points on appeal. The judgment is affirmed.

## Factual and Procedural Background

On November 26, 2018, Gibbons was charged in the Circuit Court of Jackson County with two counts of first-degree statutory sodomy and two counts of first-degree child molestation

1

involving his adopted daughter ("Victim"), born July 31, 2003. A three-day jury trial was held in June 2019. Viewed in the light most favorable to the verdict,[1] the evidence adduced at trial was as follows.

Victim was placed in foster care with Gibbons and his wife ("Mother") when she was six years old, and she lived with the Gibbons family for a few months before going to live with her grandmother. After her grandmother was diagnosed with cancer, Victim went to live with another foster family before returning to the Gibbonses. In 2012, when she was nine years old, Victim was adopted by Gibbons and Mother. The Gibbonses also adopted other children.

After she was adopted, Gibbons's behavior toward Victim changed, and he "started touching [her]." Initially, Gibbons started "touching [her] breasts." He would enter the bedroom that she shared with her younger sister "at night and kiss [her] and touch [her] places that [she] didn't want to be touched." The touching "started over [her] clothing" but progressed to "under the clothes." When Victim was nine years old, Gibbons "only touched [her] breasts."

Mother noticed that the relationship between Gibbons and Victim "started to get a little more strained." Victim "didn't want to be tickled or touched anymore."

When Victim "got a little older," Gibbons "started touching [her] vagina." Victim was "ten to 11" when Gibbons started touching her vagina. That touching started "over [her] clothing" but progressed to "under the clothes." When Gibbons touched Victim's vagina under her clothing, he touched her on the "[t]he inside." Gibbons "started to put his fingers inside [her]" when she was "11 to 12 years old."

[1] *State v. Williams*, 608 S.W.3d 205, 207 n.1 (Mo. App. W.D. 2020).

The touching occurred when Victim was in her bed,[2] and Gibbons "would come in the middle of the night, and he would start touching [her], even after [she] told him not to." The touching made Victim "feel very uncomfortable." She told him to stop, but he did not stop. Gibbons "threatened to touch [her] younger two siblings if [she] told." He gave her things that she wanted "to keep [her] mouth shut." Mother observed that Gibbons "started buying her things and just being more…secretive."

When Victim was nine or ten years old, or "[f]rom 2012 to about 2014," the touching occurred "[a]bout once a week." She did not tell anyone at first "[b]ecause [she] was afraid no one would believe [her]." By the time Gibbons was putting his fingers inside Victim's vagina, the touching was occurring "[o]nce or twice a week."

On one occasion, Gibbons "had his hands down [Victim's] pants" in the middle of the night, and Mother "walked in on him touching [Victim]."[3] Mother saw Gibbons "standing at the bedside with [Victim] in the bed," and she asked what was going on. Gibbons said "nothing," and quickly left the room. Victim buttoned up her pajama top. The next day, Mother asked Victim what had happened, and Victim told Mother that Gibbons "had touched her breasts." Mother "kicked [Gibbons] out of the house" for three days. She allowed him to return after he "promised that he had not done anything and he wouldn't never do anything like that." Mother told Victim that she "would let [Victim] sleep in her bed and lock the door to make sure that he

---

[2] Victim testified that when she was first adopted, she slept in a regular bed and her younger sister slept in a toddler bed. When her younger sister was three years old, the two girls got bunkbeds, with Victim on the top bunk and her sister on the bottom. Once her sister got older, Victim was on the bottom bunk and her sister was on the top. Victim never specified which bed she was in at any particular time that Gibbons touched her.

[3] The record is unclear on when this incident occurred. On direct examination, Victim testified that she was "between the ages of 10 and 11," which would have been between July 31, 2013 and July 30, 2015. On cross-examination, she said it occurred "in the summer of 2012" when she would have been eight or nine years old. Mother testified that this incident happened when Victim was "around the age of 11 or 12."

3

would not touch [Victim]," and that continued for about a month. Victim felt "hurt" and "betrayed" when Mother let Gibbons return home.

On one occasion, "around July" when Victim was eleven years old, Gibbons "made [Victim] touch his penis area" on the outside of his clothes. Gibbons started by "touching [her] and then he would take [her] hand and put it where he wanted it…[i]n his pants area." He had her "rub against it," and she could feel that his penis was "hard." When Victim was twelve years old and Mother was out, Gibbons "was touching [Victim] and then made [her] touch his penis" in her bedroom. Gibbons made Victim touch his penis "[e]very time [Mother] went out."

On some occasions, "[l]ike once every month," Gibbons "would get [Victim] in his bed and try to get on top of [her]." On those occasions nothing else happened, and Gibbons never had sexual intercourse with Victim.

In November 2016, Gibbons touched Victim in her bedroom. On that occasion, Victim "was texting her friends and he came in [her] room and started doing what he normally did." He touched Victim "inside" her vagina and on her breasts.

On May 14, 2017, Mother's Day, Victim was feeling "really betrayed because [her] mom let him continue to touch [her], even after [she] told her what he did." Victim texted one of her friends and "told him [she] wanted to kill [herself]." Later that same day, Deputy Eli Postlethwait of the Jackson County Sheriff's Office was dispatched to Victim's home in response to a report of "a suicidal subject of a female that had sent Snapchat messages saying a family member molested her." When he arrived, he knocked on the door and was greeted by Gibbons and Mother. They led him to a bedroom where Victim was sitting on (or near) the bed. Victim was "visibly upset" and suffering "some kind of emotional trauma," and "[h]er eyes were

4

red as if she had been crying." The deputy tried to talk to Victim, but she did not feel comfortable talking in front of her parents.

Outside, Victim told Deputy Postlethwait that she "didn't want to be around anymore" and that she "didn't want to be there." She said that "there was somebody in the house that [she] didn't feel comfortable with." She repeatedly said that she "didn't want 'it' to happen anymore." She also said that she "didn't want to disturb the family dynamic, but she was concerned for her sister." Victim did not explain what "it" was, and the deputy did not ask for clarification. Victim said that "the last time 'it' happened was about November 2016." She said that "a male family member who resided" in the home had been involved in the November 2016 incident.

Victim was taken to the hospital. She told Tammy Kemp, a social worker at the hospital, that Gibbons "was touching her in places that she didn't want to be touched." Victim said that the last touching was in "November of 2016, but it had been going on since she was 11." She said that it had happened "about ten times during that timeframe from 11 to her age." Victim received psychiatric care for "stabilization."

A few days later, Mother talked to Victim at the hospital, and Victim told her that Gibbons had "touched her on the breasts and lower." Victim gestured "with her hands through the abdomen area and lower." Over the "next several days to months," Victim told Mother that Gibbons "had touched her in the breast and in the vagina area."

On May 27, 2017, Dana Plas, an investigator from the Jackson County Children's Division, talked to Victim. Victim was reluctant to speak to Plas and appeared to be "scared and apprehensive." However, she eventually told Plas that she felt safe in her home "with her mom there." She said that she "did not feel safe if [Gibbons] was there." She disclosed that Gibbons "had touched her in places that made her feel uncomfortable."

5

On July 6, 2017, Brandy Williams, a forensic interviewer at the Child Protection Center, interviewed Victim.[4] Victim disclosed that she had been abused by Gibbons. Her leg was "shaking throughout the entirety of the interview to the point that it was kind of hard to hear her talking." She was "also tearful during certain points of the interview." Victim told Williams that Gibbons had touched "her private parts" while in her bedroom. She said that he had "rubb[ed] on top of her private part" and had touched her "with a finger on the inside of her private part." Williams understood Victim's use of the term "private part" to mean her vagina. Victim also told Williams that Gibbons touched "her chest area." Victim said that the touching began shortly after she was adopted, when she was nine years old, until she was "about 12 years old."

In July 2017, Gibbons attempted to contact Detective Penny Cole of the Jackson County Sheriff's Office. When the detective returned Gibbons's call, he asked "to know what the allegations were, so he could prepare his response." A few days later, Detective Cole met with Gibbons at the Sheriff's Office's headquarters. Gibbons told her that he did not intend to return home as long as Victim was still there. He said he could not give "any reason that [Victim] would make these allegations against him." He said that he did not want to speak about the past allegation by Victim against him and that "it had been discussed within the home, and that it had been discussed it would not happen again." Detective Cole asked Gibbons about Victim's safety, and he responded that he had moved and "was 30 to 40 minutes away from her and could

---

[4] The videotaped interview was admitted into evidence at trial, and Williams also testified at trial regarding the disclosures Victim made to her. The exhibit containing the forensic interview was not included in the record on appeal. "If original exhibits are necessary to the determination of any point relied on, they shall be deposited in the appellate court by the appellant." Rule 81.16(a). "When an exhibit is not filed with an appellate court, its intendment and content will be taken as favorable to the trial court's ruling and as unfavorable to the appellant." *State v. Johnson*, 372 S.W.3d 549, 553 n.1 (Mo. App. S.D. 2012) (internal quotes and citation omitted).

not contact her or get to her." When asked whether Victim had "led him on," Gibbons said that "he didn't know," and told the detective "to ask [Victim]."

The jury found Gibbons guilty of the four charged offenses. The trial court sentenced him to consecutive ten-year terms of imprisonment for each count of first-degree statutory sodomy and to five-year terms of imprisonment for each count of first-degree child molestation to run concurrently with the ten-year sentences. This appeal by Gibbons followed. To avoid repetition, additional relevant facts are presented below in the discussion of the issues raised in this appeal.

### Sufficiency of Information

In his first point on appeal, Gibbons contends that the trial court erred in denying his motion to dismiss the felony information on grounds of vagueness or, in the alternative, for a bill of particulars because the four counts of the information were not sufficiently clear to place him on notice of the accusations against him. He asserts that the counts did not state with sufficient particularity the dates and locations where the alleged acts occurred.

Appellate review of the trial court's denial of a motion to dismiss a criminal charge is for an abuse of discretion. *State v. Metzinger*, 456 S.W.3d 84, 89 (Mo. App. E.D. 2015). However, whether an information fails to state an offense is a question of law reviewed *de novo*. *Id.* The denial of a motion for a bill of particulars will not be disturbed unless an abuse of discretion by the trial court is shown. *State v. Celis-Garcia*, 420 S.W.3d 723, 730 n.7 (Mo. App. W.D. 2014). "A trial court abuses that discretion when the denial of the motion results in the defendant being insufficiently informed of the necessary factual details of the offense to prevent an adequate preparation of a defense." *Id.*

"The purpose of an indictment or information is to inform the accused of charges against him so that he may prepare an adequate defense and to prevent retrial on the same charges in case of an acquittal." *State v. Rohra*, 545 S.W.3d 344, 347 (Mo. banc 2018). The test for the sufficiency of a charging document is whether it contains the essential elements of the offense charged as set out in the statute or statutes that define the offense and clearly apprises the defendant of the facts constituting the offense. *State v. Williams*, 126 S.W.3d 377, 380 (Mo. banc 2004); *Rohra*, 545 S.W.3d at 347. Rule 23.01(b) specifies the requirements of indictments and informations. *State v. Hendren*, 524 S.W.3d 76, 84 (Mo. App. W.D. 2017).

Relevant to Gibbons's point, Rule 23.01(b)(2) instructs that an indictment or information shall "[s]tate plainly, concisely, and definitely the essential facts constituting the elements of the offense charged." Rule 23.01(b)(3) provides that an indictment or information shall "[s]tate the date and place of the offense charged as definitely as can be done. If multiple counts charge the same offense on the same date or during the same time period, additional facts or details to distinguish the counts shall be stated." Rule 23.01(b) provides that if an indictment or information is substantially consistent with the forms of indictments or informations that have been approved by the Missouri Supreme Court, it is deemed to comply with the requirements of Rule 23.01(b).

Gibbons argues that the broad time periods and lack of specific location in Counts I through IV hindered his ability to marshal the potential defenses of alibi, lack of access to the alleged victim, or innocuous contact. He asserts that there was evidence that he engaged in horseplay and wrestling in a non-sexual manner but that the charging document was too vague to use this evidence as a defense.

8

The information adequately charged the time and location of the offenses. "A person commits the crime of statutory sodomy in the first degree if he has deviate sexual intercourse with another person who is less than fourteen years of age." § 566.062.1, RSMo Supp. 2014. "Deviate sexual intercourse" is defined, in pertinent part, as "any act involving the genitals of one person and the hand…of another person or a sexual act involving the penetration, however slight, of the…female sex organ…by a finger…done for the purpose of arousing or gratifying the sexual desire of any person[.]" § 566.010(1), RSMo Supp. 2014. The pattern charge for first-degree statutory sodomy in effect at the time of the offenses required the information to allege, in pertinent part:

> that (on) (on or about) [*date*], in the (City) (County) of _____, State of Missouri, the defendant (for the purpose of arousing or gratifying the sexual desire of [*name of person*]) (for the purpose of terrorizing [*name of victim*]) had deviate sexual intercourse with [*name of victim*], who was then a child less than (fourteen) (twelve) years old, by [*Describe acts constituting deviate sexual intercourse.*] (.)

MACH-CR 20.11.

Counts I and II charged Gibbons with statutory sodomy in the first degree. Count I alleged that "on or between July 31, 2012 and July 30, 2015, in the County of Jackson, State of Missouri, the defendant for the purpose of arousing or gratifying the sexual desire of the defendant, had deviate sexual intercourse with [Victim], who was then less than twelve years old, by touching [Victim's] genitals with the defendant's fingers." Count II was identical, except that it alleged that the offense occurred "on or between July 31, 2016 and May 14, 2017," and that defendant used his "hand."

"A person commits the crime of child molestation in the first degree if he or she subjects another person who is less than fourteen years of age to sexual contact." § 566.067.1, RSMo Supp. 2014. "Sexual contact" is defined, in pertinent part, as "any touching of another person

9

with the genitals or any touching of the genitals…of another person,…or such touching through the clothing, for the purpose of arousing or gratifying sexual desire of any person[.]" § 566.010(3), RSMo Supp. 2014.  The pattern charge for first-degree child molestation in effect at the time of the offenses required the information to allege, in pertinent part:

> that (on) (on or about) [*date*], in the (City) (County) of _____, State of Missouri, the defendant knowingly subjected [*name of victim*] who was then less than fourteen years old to sexual contact by [*Describe conduct.*](.)

MACH-CR 20.17.

In Counts III and IV, Gibbons was charged with child molestation in the first degree. Count III alleged that "on or between July 31, 2014 and July 30, 2015, in the County of Jackson, State of Missouri, the defendant knowingly subjected [Victim] who was then less than fourteen years old to sexual contact by touching the [Victim's] hand to the defendant's genitals through the defendant's clothing."  Count IV was identical to Count III, except that the charged period was "on or between July 31, 2015 and July 30, 2016."

That the charges set forth "time periods" rather than particular dates did not render them insufficient.  Rule 23.01(b)(3) expressly contemplates charges during a "time period." Specifically, "[i]f multiple counts charge the same offense…during the same time period, additional facts or details to distinguish the counts shall be stated."  *Id.*  Here, although some of the counts charged the same offense, they did not charge the same time period.  Thus, the State was not required to provide "additional facts or details to distinguish the counts."[5]  Time is not of the essence in sex offense cases under Missouri law.  *Tucker v. State*, 468 S.W.3d 468, 473 (Mo.

---

[5] While there was evidence that multiple acts of the same type occurred during each time period, that circumstance merely raised potential jury-unanimity issues as in *State v. Celis-Garcia*, 344 S.W.3d 150 (Mo. banc 2011).  *See* MACH-CR 20.11, Notes on Use 4.  See point two below.

10

App. E.D. 2015).  "One reason general allegations of time are permitted in child sex abuse cases, in particular, is that children who are the victims of abuse may find it difficult to recall precisely the dates of offenses against them months or even years after the offense has occurred."  *Id.* at 473-74 (internal quotes and citation omitted).  Section 545.030.1(5), RSMo 2016, provides that a charging document will not be deemed invalid for omitting the time at which the offense was committed, or for stating it imperfectly, in cases where time is not of the essence.  *Tucker*, 468 S.W.3d at 474.

Here, Victim did not specifically identify when all of the various acts occurred, but her statements indicated that Gibbons started touching her vagina with his fingers or hand when she was ten years old and continued until shortly before she reported the sexual abuse on May 14, 2017.  However, one definite dividing point for the evidence was Victim's thirteenth birthday, because Victim identified a specific act of digital penetration of her vagina in November 2016, when she was thirteen years old.  Accordingly, the information properly alleged that Count I occurred between July 31, 2012 (Victim's ninth birthday), and July 30, 2015 (the day before her twelfth birthday), and that Count II occurred between July 31, 2016 (her thirteenth birthday), and May 14, 2017 (the date she ultimately disclosed the sexual abuse).

The time periods were also sufficiently definite in Counts III and IV.  Victim described multiple, identical instances when Gibbons made her touch his penis through clothing.  A distinguishing detail was that this conduct occurred both when Victim was eleven years old and twelve years old.  Thus, the information properly alleged that Count III occurred between July 31, 2014, and July 30, 2015 (when Victim was eleven) and that Count IV occurred between July 31, 2015, and July 30, 2016 (when Victim was twelve).

Furthermore, the information was not insufficient for failing to allege specific locations

11

where the alleged acts occurred.  Because all of the relevant sexual activity occurred in the same bedroom while Victim was in her bed, inclusion of that precise location in the information would not have aided Gibbons in asserting a defense based on alibi, lack of access, or "horseplay or wrestling."  Contrary to the possibility of asserting these defenses, the evidence showed that Victim lived with Gibbons throughout the charged time periods, and Gibbons never alleged that he was not living in the home (or did not have access to Victim) for any significant period of time during those time periods.  Additionally, while the defense elicited evidence that Mother observed Gibbons "wrestle" with the children and "hors[e] around in a playful fashion with [Victim]," no specific times were elicited, and there was no evidence that Mother saw such activities occur in Victim's bed.

Finally, the language of each count was substantially consistent with the approved pattern forms.  The forms did not require the address or specific bedroom where the offenses occurred. The charges are deemed to comply with the requirements of Rule 23.01(b).  Rule 23.01(b); *Williams*, 126 S.W.3d at 381.

The information sufficiently apprised Gibbons of the essential elements of the offense and of the facts constituting the offense so that he could prepare a defense.  The trial court did not err or abuse its discretion in denying Gibbons's motion to dismiss the felony information on grounds of vagueness or in the alternative his request for a bill of particulars.

Point one is denied.

### Verdict Directors and Juror Unanimity

In point two, Gibbons contends that the trial court erred in refusing to give his proffered verdict directing instructions A, B, C, and D and instead giving Instructions 5, 7, 9, and 11. Gibbons's proffered verdict directors differed from those submitted to the jury by suggesting the

12

addition of the phrase, "in [Victim's] bedroom at 1822 N. Vista while [Victim] was on top of her bunkbed." He argues that in the absence of this modification, the verdict directors violated his right to a unanimous verdict because they were not sufficiently specific to guarantee that each juror agreed on the same underlying act for each count.

Whether a jury has been properly instructed is a question of law, which is reviewed *de novo*. *State v. Walker*, 549 S.W.3d 7, 10 (Mo. App. W.D. 2018). "Article I, section 22(a) of the Missouri Constitution protects the right to a unanimous jury verdict." *Id.* (citing *State v. Celis-Garcia*, 344 S.W.3d 150, 155 (Mo. banc 2011)). "For a jury verdict to be unanimous, the jurors must be in substantial agreement as to the defendant's acts, as a preliminary step to determining guilt." *Celis-Garcia*, 344 S.W.3d at 155 (internal quotes and citations omitted). The issue of jury unanimity may be implicated in multiple act cases. *Walker*, 549 S.W.3d at 11. "A multiple acts case arises when there is evidence of multiple, distinct criminal acts, each of which could serve as the basis for a criminal charge, but the defendant is charged with those acts in a single count." *Celis-Garcia*, 344 S.W.3d at 155-56.

In *Celis-Garcia*, the State presented evidence of multiple acts (separate instances) of hand-to-genital contact (statutory sodomy) against the child victims, and those separate instances could be differentiated by specific surrounding circumstances and by location (different rooms of the same home). *Id.* at 153-54. However, the verdict directors generically alleged one hand-to-genital contact during a time frame that included the various multiple and distinct *and distinguishable* instances of alleged abuse. *Id.* at 154-55. "'In such cases, the possibility exists that jurors follow the trial court's instructions, yet individually choose differing instances of the crime on which they base the conviction, violating the defendant's right to a unanimous verdict.'" *State v. Dutcher*, 583 S.W.3d 440, 441-42 (Mo. App. S.D. 2019) (quoting *State v.*

13

*Armstrong*, 560 S.W.3d 563, 570 (Mo. App. E.D. 2018)). The *Celis-Garcia* court made it clear that it was not addressing the situation where there were "repeated, identical sexual acts committed at the same location and during a short time span" and where the victim may be "unable to distinguish sufficiently among the acts." *Celis-Garcia*, 344 S.W.3d at 157 n.8.

In *Walker*, the victims testified to repeated, identical sexual acts (statutory rape) committed at the same location (in the defendant's bedroom) during a particular time span and did not testify to differentiated surrounding circumstances on specific dates. *Walker*, 549 S.W.3d at 11-12. The record contained no evidentiary basis for the jurors to distinguish between the multiple acts of abuse. *Id.* In *Walker*, the submitted verdict directors required the jury to find that "the defendant knowingly had sexual intercourse with [the victims] in defendant's bedroom." *Id.* at 10. In *Walker*, the defendant argued that the instruction denied him the right to a unanimous verdict, as there were multiple acts of sexual abuse within the time frame. *Id.* The *Walker* court acknowledged that it was a multiple acts case, but concluded that the verdict directing instructions were proper:

> With the factual restrictions contained in this verdict director [the time frame and in the defendant's bedroom], there was no further basis upon which the jurors could possibly distinguish one act of statutory rape from another. Because the jurors had no evidentiary basis upon which to differentiate between these repeated acts, Walker's right to a unanimous verdict was not at risk of being violated.

*Id.* at 12. *See also Dutcher*, 583 S.W.3d at 442, and *Armstrong*, 560 S.W.3d at 572-74, for similar holdings.

In one of the counts charged in *State v. Adams*, 571 S.W.3d 140 (Mo. App. W.D. 2018), the victim, during pre-trial interviews, "generally reported that [the defendant had] touched her 'privates' with his fingers more than one time[,]" and described a particular incident by location

14

in the residence and by what was on television.  *Id.* at 151.[6]  At trial, the victim generally testified about multiple incidents of molestation involving hand-to-genital contact, then testified on cross-examination that these incidents always occurred while Victim was seated in the defendant's lap, and "sometimes" occurred when she and the defendant were "playing crafts." *Id.*  The *Adams* court concluded that the cross-examination testimony did not differentiate any of the multiple incidents of molestation in a sufficiently specific way as to permit the conclusion that more than one specifically particularized incident had been identified in the evidence.  *Id.* at 152.  Thus, it concluded that the defendant's right to a unanimous verdict was not implicated because the evidence did not describe multiple, distinct acts where the defendant touched the victim's genitals.  *Id.* at 152.

### Multiple, Distinct, but Undifferentiated, Criminal Acts
### Count I (Instruction No. 5), Count III (Instruction No. 9), and Count IV (Instruction No. 11)

In this matter, Instruction No. 5, the verdict director for the first count of first-degree statutory sodomy (Count I) directed the jury to determine, in pertinent part, whether  "in the County of Jackson, State of Missouri, the defendant knowingly penetrated [Victim's] genitals with the defendant's fingers for the first time" on or between July 31, 2012, and July 30, 2015 (i.e., on the day or after Victim turned nine years old but before she turned twelve years old). Gibbons's proffered Instruction A would have directed the jury to determine, in pertinent part, whether "in the County of Jackson, State of Missouri, the defendant knowingly penetrated [Victim's] genitals with the defendant's fingers for the first time *in [Victim's] bedroom at 1822*

---

[6] In *Adams*, the defendant also challenged a separate conviction on appeal, and said conviction was reversed and remanded, as there were separate distinct multiple acts of abuse in the time frame being addressed, whereas the verdict director for that charge did not provide sufficient details of one of the distinct multiple acts to thus ensure juror unanimity.  *Id.* at 146-49.

15

*N. Vista while [Victim] was on top of her bunkbed*" on or between July 31, 2012 and July 30, 2015. (emphasis added).

The trial court did not err in submitting Instruction No. 5 (and in refusing to submit Instruction A). The evidence showed that Victim was adopted by Gibbons and Mother when she was nine years old. Victim testified that when she "got a little older," Gibbons "started touching [her] vagina." She was "ten to 11" when Gibbons started touching her vagina. That touching started "over [her] clothing" but progressed to "under the clothes." When Gibbons touched Victim's vagina under her clothing, he touched her on "[t]he inside." Gibbons "started to put his fingers inside [her]" when she was "11 to 12 years old." The touching occurred when Victim was in her bed, and Gibbons "would come in the middle of the night, and he would start touching [her], even after [she] told him not to." Victim further testified that by the time Gibbons was putting his fingers inside her vagina, the touching was occurring "[o]nce or twice a week."

Victim did not testify to particular acts on particular dates or differentiate between the repeated, identical acts in any way during the time frame encompassed by Instruction No. 5.[7] As in *Walker*, though there was evidence of multiple, distinct acts of chargeable conduct (statutory

---

[7] Victim testified that, on one occasion, when she was "between the ages of 10 and 11," or "in the summer of 2012," or when Victim was "around the age of 11 or 12," Gibbons "had his hands down [Victim's] pants" in the middle of the night, and Mother "walked in on him touching [Victim]." Mother saw Gibbons "standing at the bedside with [Victim] in the bed," and she asked what was going on. Victim did not testify that Gibbons's finger touched or penetrated her vagina that night. Furthermore, even if this were construed as the sole differentiated act of statutory sodomy (which we do not find), it would not require reversal, for the reasons set forth *Adams* and, as discussed hereinbelow respecting Count II (Instruction No. 7).

Additionally, the State's reliance on the importance of designating that the "first" instance of the statutory sodomy (or for that matter, the "last" instance of child molestation as alleged in Count IV, Instruction No. 11) is misplaced. Had there been multiple distinct *and distinguishable* acts of abuse (something we do not find) the designation of the "first" instance (or the "last" instance) would not assure jury unanimity, as it could not assure that the jurors were agreeing *which* distinct act was the first (or last) criminal act. At very most, it imposes an additional burden on the State, as it requires the jury to find that the indistinguishable multiple acts began (or ended) during the given time frames.

16

sodomy) that occurred during the time frame encompassed in Instruction No. 5, none of the acts were specifically described (distinguishable) as would violate Gibbons's right to a unanimous verdict. *See Walker*, 549 S.W.3d at 11-12. *See also Dutcher*, 583 S.W.3d at 442, and *Armstrong*, 560 S.W.3d at 572-574, for similar holdings where there were multiple (but undifferentiated) acts that did not implicate the defendants' right to a unanimous verdict.

Gibbons asserts that the instruction should have further clarified that the digital penetration occurred "for the first time in [Victim's] bedroom at 1822 N. Vista while [Victim] was on top of her bunkbed." While Victim did testify that she was in her bed when Gibbons touched her "in" or "inside" her vagina, she did not specify where her bed was situated (regular bed or top or bottom bunk) when the acts occurred. When pressed about when the change in bed arrangements occurred, Victim could not give a precise timeline, and never correlated that change with any of the instances of alleged abuse (regarding any of the counts). The evidence presented was that every chargeable act of statutory sodomy (digital penetration of Victim's vagina by Gibbons), in the given time frame, took place when Victim was in her bed, in her bedroom, at her home in Jackson County. There was no direct evidence that the Gibbons first digitally penetrated Victim's vagina at a time she was on the top bunk of her bunkbed. The trial court did not err in giving Instruction No. 5 and in refusing Instruction A, as there were no multiple distinct and differentiated acts of abuse, and there was no evidentiary basis to qualify the instruction on Count I as proposed by Gibbons.[8]

---

[8] Gibbons also argues that Victim "also testified the alleged abuse occurred in [Gibbons's] bed." Victim testified that on those occasions, Gibbons was trying "to get on top of [her]" or trying "to put his penis in [her]." She also testified that on those occasions, nothing else happened. There was no evidence that Gibbons penetrated Victim's genitals with his fingers while on Gibbons's bed; and therefore, no evidence of a distinguishable/differentiated incident of statutory sodomy.

Instruction No. 9, the verdict director for the first count of first-degree child molestation (Count III), directed the jury to determine, in pertinent part, whether "in the County of Jackson, State of Missouri, the defendant caused [Victim's] hand to touch defendant's genitals through the clothing" on or between July 1, 2015 and July 30, 2015 (i.e., while Victim was eleven years old, in the thirty-day period immediately before Victim turned twelve). Gibbons's proffered Instruction C would have again additionally required to jury to determine that such act of child molestation occurred "in [Victim's] bedroom at 1822 N. Vista while [Victim] was on top of her bunkbed."

Victim testified that "around July," when she was eleven years old,[9] Gibbons "made [her] touch his penis area" on the outside of his clothes. Gibbons started by "touching [her] and then he would take [her] hand and put it where he wanted it…[i]n his pants area." He had her "rub against it," and she could feel that his penis was "hard."

Instruction No. 9 adequately instructed the jury. Victim's testimony about being forced to touch Gibbons's penis through his clothing, in July, when she was eleven years old, described repeated, identical acts that were not differentiated by any other facts. Victim testified that these acts occurred in her bed, in her bedroom, and did not distinguish where her bed was situated when any specific act of molestation occurred. Gibbons again asserts that the verdict director should have included the additional facts that the touching occurred "in [Victim's] bedroom at 1822 N. Vista while [Victim] was on top of her bunkbed." However, the inclusion of these additional facts would not have provided any basis for the jury to differentiate one act from another because all of the instances of touching Gibbons's penis through his clothing occurred in

---

[9] Victim turned eleven on July 31, 2014, thus, she was eleven years old in July 2015, until she turned twelve on July 31, 2015.

Victim's bedroom, in her house, and in her bed. Since the Victim did not testify where her bed was situated when these acts occurred, it would have been improper to require the jury to determine that the alleged indistinct act of molestation took place when Victim was on the top bunk. There were not multiple, distinct acts that could be differentiated and considered by the jury, consequently "there was no risk that the jurors could have based the conviction[] on different underlying criminal acts." *Dutcher*, 583 S.W.3d at 442.

Instruction No. 11, the verdict director for the second count of first-degree child molestation (Count IV), directed the jury to determine, in pertinent part, whether "in the County of Jackson, State of Missouri, the defendant caused [Victim's] hand to touch defendant's genitals through the clothing for the last time" on or between July 31, 2015 and July 30, 2016 (i.e., while Victim was twelve years old). Gibbons's proffered Instruction D would have again directed the jury to determine, that such act of abuse occurred "in the County of Jackson, State of Missouri,…for the last time *in [Victim's] bedroom at 1822 N. Vista while [Victim] was on top of her bunkbed*" on or between July 31, 2015 and July 30, 2016. (emphasis added).

The trial court did not err in submitting Instruction No. 11, and in refusing to give Instruction D. Victim testified that when she was twelve years old and her mother was out, Gibbons "made [her] touch his penis" in her bedroom. She said that Gibbons made her touch his penis "[e]very time [Mother] went out." In her forensic interview, Victim stated that she was twelve years old the last time Gibbons made her touch his "private part."[10] Victim's testimony

---

[10] Gibbons does not challenge this statement in the State's brief regarding Victim's statement in the forensic interview. As noted in footnote 4 above, Gibbons failed to include the exhibit containing the forensic interview in this record on appeal. Its contents, including this statement by Victim during the interview, are therefore taken as favorable to the trial court's ruling and unfavorable to Gibbons. *Johnson*, 372 S.W.3d at 553 n.1.

19

about being forced to touch Gibbons's penis through his clothing when she was twelve years old described repeated, identical acts that were not differentiated by any other facts. Gibbons again endeavors, in his proposed instruction, to require the jury to determine that the abuse occurred when Victim "was on top of her bunkbed." But, again, the evidence showed that every time Gibbons made Victim touch his penis through his clothes when she was twelve years old, Victim was in her bedroom, in her house, and in her bed; and there was no evidence that this necessarily (or ever) occurred when Victim was in the top bunk.

Because the jurors had no evidentiary basis upon which to differentiate between repeated acts of hand-to-genital child molestation that occurred when Victim was age twelve, Gibbons's right to a unanimous verdict was not at risk of being violated. *Walker*, 549 S.W.3d at 11-12. The trial court did not err in giving Instruction No. 11 and in refusing Instruction D.

### B. One Distinct Act Consistent with Other Multiple Undistinguishable Acts Count II (Instruction No. 7)

Instruction No. 7, the verdict director for the second count of first-degree statutory sodomy (Count II), directed the jury to determine, in pertinent part, whether "on or between November 1, 2016 and November 30, 2016, in the County of Jackson, State of Missouri, the defendant knowingly penetrated [Victim's] genitals with the defendant's hand *at [Victim's] home*." (emphasis added). Gibbons's proffered Instruction B would have directed the jury to determine, in pertinent part, whether "on or between November 23, 2016 and November 30, 2016 in the County of Jackson, State of Missouri, the defendant knowingly penetrated [Victim's] genitals with the defendant's hand *in [Victim's] bedroom at 1822 N. Vista while [Victim] was on top of her bunkbed*." (emphasis added).

20

As previously described, Victim testified that Gibbons started touching the inside of her vagina when she was eleven to twelve years old and that the touching would occur in her bedroom once or twice a week. This testimony described repeated, undifferentiated acts of digital penetration of Victim's genitals. While it is not entirely clear from Victim's testimony whether these repeated, undistinguishable instances of digital penetration had stopped (or continued) into November of 2016, it is clear that Victim provided details about a single, specific incident in November 2016 when Gibbons touched her in her bedroom. On that occasion, Victim "was texting her friends and he came in [her] room and started doing what he normally did." He touched the "inside" of Victim's vagina and touched her breasts.[11] No other details were provided about any other particular incident that may have occurred in November of 2016, and there is nothing in Victim's testimony that distinguishes where, in her bedroom, the specifically-described incident, or other possible incidents, occurred.

If the incident where Victim was texting her friends shortly before she was abused was the only incident of statutory sodomy supported by the evidence in November of 2016, there would be no issue at all respecting multiple acts of juror unanimity (regarding Count II, Instruction No. 7). However, in the absence of testimony clearly indicating that the one specifically described incident was the only incident in November of 2016, the jurors might have inferred that there were multiple distinct acts of statutory sodomy (defendant's hand/fingers inserted in Victim's vagina) in that period. That being the case, we must examine whether Instruction No. 7 adequately assured juror unanimity regarding the one count of statutory

---

[11] That same month, Victim went to Oklahoma. She testified that while there, Gibbons touched her vagina and breasts. That conduct did not occur in Jackson County; thus, the verdict director did not need to further differentiate that conduct from the charged conduct.

21

sodomy that was alleged to have occurred in November 2016. We first note that the one incident of statutory sodomy specifically described by Victim (shortly after texting her friends) was consistent with the multiple indistinguishable acts of statutory sodomy (described by Victim as beginning when she was aged 11 or 12) – insertion of Gibbons's hand (fingers) in her vagina, in her bed, in her bedroom.

Instruction No. 7 sufficiently ensured juror unanimity in finding Gibbons guilty under Count II (statutory sodomy in November 2016). The instruction required the jury to determine that "on or between November 1, 2016 and November 30, 2016, in the County of Jackson, State of Missouri, the defendant knowingly penetrated [Victim's] genitals with the defendant's hand at [Victim's] home." The evidence disclosed only one distinguishable instance of penetration of Victim's genitals in November 2016 in Jackson County. Victim did not describe any other differentiated act of digital penetration of her vagina in November 2016, in Jackson County, Missouri. As in *Adams*, supra, the one distinguishable event among identical (but indistinguishable) incidents, "did not implicate [Gibbons's] right to a unanimous verdict because the evidence did not describe multiple, distinct acts, any one of which could have supported a finding of guilt." *Adams*, 571 S.W.3d at 150.

Gibbons asserts that the instruction should have further clarified that the penetration occurred "in [Victim's] bedroom at [Victim's address] while [Victim] was on top of her bunkbed." However, the addition of "[Victim's] bedroom" would not have added a differentiating fact, because Victim did not testify that Gibbons penetrated her vagina in November 2016 in any other room. Additionally, there was no evidence that Victim was "on the top of her bunkbed" when she was digitally penetrated by Gibbons. In fact, Victim was clear that, by November of 2016, she was sleeping on the bottom bunk. Because there was only

evidence of one distinct incident of Gibbons's penetrating Victim's vagina in November 2016, and because there was no evidence that the one differentiated incident (or that the other possible undifferentiated incidents) occurred "on the top of [Victim's] bunkbed," the trial court did not err in giving Instruction No. 7 and in refusing Instruction B.

Point two is denied.

### Failure to Give Curative Instruction During Voir Dire

In his third point on appeal, Gibbons contends that the trial court erred in failing to give a curative limiting instruction during jury selection when the prosecutor stated that the defense would possibly call witnesses. He asserts that the comment improperly shifted the burden of proof to him.

The trial court generally has wide discretion in the conduct of voir dire, and is vested with discretion to judge the appropriateness of specific questions. *State v. Oates*, 12 S.W.3d 307, 310 (Mo. banc 2000). The appellate court reviews the trial court's refusal to give a curative instruction for an abuse of discretion. *State v. Byers*, 551 S.W.3d 661, 667 (Mo. App. E.D. 2018). The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.* at 667-68.

During voir dire, the prosecutor stated, "Part of your job as a jury will be to determine the credibility of the witnesses that are called in this case, either by the State *or possibly by the defense.*" (emphasis added). At the bench, defense counsel objected, stating that the defense had no obligation to present any evidence and that the statement was "a direct comment on the defendant." Defense counsel asked the trial court to instruct the jury that "the defense has no obligation to adduce any evidence." The trial court agreed that the defense was not obligated to

23

present any evidence, sustained the objection, but declined to "emphasize it by giving an instruction at this time." It directed the prosecutor not to intimate that the defense "might or should call witnesses."

The trial court did not abuse its discretion in failing to give a curative instruction. "Due process commands that no man shall lose his liberty unless the Government has borne the burden of…convincing the factfinder of his guilt." *In re Winship*, 397 U.S. 358, 364 (1970) (internal quotes and citation omitted). To that end, the jury is instructed on the presumption of innocence and the State's burden of proof:

> The defendant is presumed to be innocent, unless and until, during your deliberations upon your verdict, you find him guilty. This presumption of innocence places upon the state the burden of proving beyond a reasonable doubt that the defendant is guilty.

MAI-CR 4th 402.04.

Here, the prosecutor's statement that the defense might "possibly" call witnesses did not impermissibly shift the burden to proof. The prosecutor did not state or suggest that the defense was obligated to call witnesses, that the defense should call witnesses, or that the defense had to prove or disprove any particular fact. Rather, the prosecutor merely indicated that the defense might possibly call witnesses when discussing the jury's duty to determine the credibility of witnesses. Gibbons does not cite any authority suggesting that such a comment during voir dire impermissibly shifts the burden of proof.[12]

---

[12] Indeed, in related cases, Missouri courts have held that similar comments in voir dire did not warrant a mistrial on the grounds that the prosecutor commented on the defendant's right not to testify. *See State v. Wold*, 882 S.W.2d 200, 204-05 (Mo. App. E.D. 1994) ("The defense in this case may or may not call any witnesses—."); *State v. Shanz*, 716 S.W.2d 472, 476 (Mo. App. S.D. 1986) ("defendant may or may not present evidence"); *State v. Bufalo*, 562 S.W.2d 114, 117-18 (Mo. App. 1977) (prosecutor informed the jury that it was to listen to the evidence presented by "Mr. Kreisman (the defense attorney) and myself….").

24

Furthermore, to the extent that the prosecutor's comment could have been viewed as an indirect suggestion that the defense had the burden of proof, the trial court did not abuse its discretion in deciding not to highlight the comment with a curative instruction. "The trial court is in the best position to determine any prejudicial effect on the jury." *State v. Russell*, 533 S.W.3d 807, 815 (Mo. App. E.D. 2017). Sometime, a curative instruction will serve only to amplify an otherwise isolated comment. *Id.* Here, trial court specifically stated that it did not want to emphasize the statement by giving an instruction. Because the prosecutor did not directly state that the defense had to call witnesses or prove any facts, the court's direction to the prosecutor not to intimate that the defense "might or should call witnesses" was sufficient.

Finally, the prospective jurors were repeatedly informed during voir dire that the State bore the burden of proof. Defense counsel also informed the jury that if Gibbons elected not to testify, it might be instructed that it could not "use his election not to testify as any evidence whatsoever against him." The trial court instructed the jury in accordance with MAI-CR 4th 402.04 discussed above. It also instructed the jury in accordance with MAI-CR 4th 408.14, which provided, "Under the law, a defendant has the right not to testify. No presumption of guilt may be raised and no inference of any kind may be drawn from the fact that the defendant did not testify." Thus, any error in failing to give a curative instruction was cured during voir dire and by the court's instructions to the jury. The trial court did not abuse its discretion in failing to give a curative instruction during voir dire.

Point three is denied.

### Failure to Strike Venireperson for Cause

In his fourth point on appeal, Gibbons contends that the trial court erred in failing to strike for cause Venireperson 21. He claims that the venireperson was not a fair and impartial

25

juror because he indicated that his wife and mother-in-law were both victims of sexual assault, that adults tend to downplay children's statements concerning sexual abuse, that lawyers put words into mouths of minors involved in court proceedings, and that it would be difficult for him to be fair and impartial. He asserts that the trial court's failure to strike for cause the venireperson left an incompetent venireperson on the panel forcing him to use one of his peremptory strikes to remove Venireperson 21.

Section 494.480.4, RSMo 2016, provides in pertinent part:

The qualifications of a juror on the panel from which peremptory challenges by the defense are made shall not constitute a ground for the granting of a motion for new trial or the reversal of a conviction or sentence unless such juror served upon the jury at the defendant's trial and participated in the verdict rendered against the defendant.

"Missouri law is clear that a conviction cannot be challenged based on the trial court's failure to strike for cause a prospective juror if that prospective juror was removed by a peremptory challenge." *State v. Gill*, 167 S.W.3d 184, 194 (Mo. banc 2005). *See also State v. Jamison*, 365 S.W.3d 623, 627 (Mo. App. E.D. 2012). "There is no constitutional violation when the jury actually seated is composed of qualified and impartial jurors." *Jamison*, 365 S.W.3d at 627 (citing *Gill*, 167 S.W.3d at 194). Because Venireperson 21 did not actually sit on Gibbons's jury panel or participate in the verdict, Gibbons cannot challenge the trial court's failure to strike for cause the venireperson.

Point four is denied.

**Admission of Expert Testimony**

In point five, Gibbons contends that the trial court erred in allowing Brandy Williams, the forensic interviewer, to provide expert testimony regarding delayed disclosures of sexually abused children. He asserts that her expert testimony was not relevant; the topic of delayed

26

disclosure did not require expert testimony; the testimony did not satisfy the standards of section 490.065.2, RSMo Cum. Supp. 2020, governing the admissibility of expert testimony in criminal cases, because it was not based on sufficient facts or data and was not the product of reliable principles or data; and the methods and principles could not be applied to the facts of the case without usurping the authority of the jury.

"A trial court has broad discretion to admit or exclude evidence at trial." *State v. Zink*, 181 S.W.3d 66, 72 (Mo. banc 2005) (internal quotes and citation omitted). Appellate review of the trial court's ruling on the admission of evidence is for abuse of discretion. *Id.* at 72-73. On direct appeal, review is "for prejudice, not mere error." *Id.* (internal quotes and citation omitted). "Trial court error in the admission of evidence is prejudicial if the error so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion without the error." *State v. Suttles*, 581 S.W.3d 137, 145 (Mo. App. E.D. 2019) (internal quotes and citation omitted).

Williams testified, in relevant part, that disclosure is "a process not an event. So oftentimes that means that children may disclose in different ways and in different pieces." She explained that a child might deny abuse or "minimiz[e] something…say[ing] something like, it only happened one time." She stated that children "often then become more active in their disclosure" after an initial disclosure. She said that children will also recant, which can be followed by reaffirmation of the original disclosure.

Williams testified that, in her experience as a forensic interviewer, "most children are not disclosing right away." She indicated that most times, "[t]hese are things that happened when they were younger and they told later, or someone found out something later and then asked

27

them about it." Williams testified that delayed disclosure can potentially affect a child's ability to recall details. She stated that she sometimes learns during an interview that "at some point the child made a disclosure of abuse, [and] nothing came [of] that disclosure."

Gibbons first asserts that Williams's testimony about delayed disclosure "was not relevant as this case did not involve a delayed disclosure." He argues that Victim "made a contemporaneous disclosure to her mother, her brother, and several friends while the alleged abuse was occurring." However, the limited disclosures that Victim made to Mother, her brother, and her friends did not render Williams's testimony irrelevant.

The evidence showed that, after the incident when Mother walked into Victim's bedroom and saw Gibbons standing by the bed (which occurred sometime when Victim was nine, ten or eleven years old), when questioned by her Mother the next day, Victim told Mother that Gibbons had touched her breasts. Victim later reported the same incident to her brother. Much later, Victim disclosed something to two of her friends "sometime" in 2017—shortly before she disclosed the abuse to law enforcement on May 14, 2017 (then age 13).

On this record, Williams's testimony about the process of disclosure and delayed disclosure was highly relevant on the issue of why Victim might not have immediately disclosed the sexual abuse, which began when she was nine years old. Her testimony was also relevant as to why Victim might make a limited disclosure to her mother and brother (while withholding other information) and why Victim might then delay any further (and more detailed) disclosures until 2017. This case involved delayed disclosure, limited disclosure, and eventual disclosure of more information over time. Missouri court "have repeatedly held that delayed-disclosures evidence is relevant in cases involving child-victims of sexual abuse." *Suttles*, 581 S.W.3d at 149.

28

Gibbons next asserts that Williams's testimony "should have been excluded as the jurors' own knowledge and experience made them capable of understanding various reasons for delayed disclosures without expert testimony." He argues that expert testimony should not be admitted unless it is clear that, for want of experience or knowledge of the subject, the jurors are not capable of drawing correct conclusions from the facts proved.

Discussing the 2017 enactment of subsection 2 of section 490.065, the Missouri Supreme Court recently explained, "Nothing in this statute requires that jurors must be wholly ignorant of the topic on which the expert would testify or utterly incapable of drawing a proper conclusion from the facts in evidence without it." *State v. Carpenter*, 605 S.W.3d 355, 360 (Mo. banc 2020). "Instead, the threshold test is merely whether the expert's testimony (which may or may not include opinions) will 'help' the jury understand the evidence or decide the contested issues." *Id.* Generalized testimony about "behaviors commonly found in child-victims of sexual abuse" is relevant and admissible because it "assists the jury in understanding the behavior of sexually abused children, a subject beyond the range of knowledge of the ordinary juror." *Suttles*, 581 S.W.3d at 149 (internal quotes and citation omitted). "Missouri courts have long recognized that testimony explaining delayed disclosures, even if not given that precise phrase, assists the jury in understanding the behavior of sexually abused children." *Id.* at 151 (internal quotes and citation omitted).

Gibbons next argues that Williams's testimony did not satisfy the requirements of section 490.065.2. He claims that her testimony was "not based on sufficient facts or data," in that she testified that "she has not reviewed or been a part of studies or research regarding delayed disclosures." He asserts that she was "not aware of any articles or empirical studies conducted by Tom Lyons, a respected expert in the field of forensic interviews." He also asserts that

29

Williams "did not know if her training in the reasons for delayed disclosures was subject to any peer review" and that she did not "state her work and techniques as a forensic interviewer was subject to peer review."

At a pre-trial 491 hearing, Williams testified about her education, training, and experience. She testified that she had a bachelor's degree in psychology and a master's degree in social work and was licensed in Missouri and Kansas. She had been a forensic interviewer at the Child Protection Center for eight years and, before that, she had worked as a forensic interviewer in Florida. She had received "on-the-job training, as well as training in interview protocols we utilize, peer reviews that we would do and any other national training that budgeting allowed for." Specifically, she was trained on the "Courthouse Forensic Interview," the "Minnesota," and the "ChildFirst" interview protocols. She stated that she had conducted "[a] little over 1900" forensic interviews.

Williams testified that the ChildFirst protocol is "a research based interview protocol." She said that she believed the research was based on peer reviewed studies. She also stated that she was aware of some peer reviewed studies for her training, specifically "any type of documentation from Tom Lyon who is out of California…[and] does a lot of research based on forensic interviewing in general." She testified that at the Child Protection Center the interviewers would conduct in-house peer reviews of interviews.

Williams testified that she had gained experience about disclosures by child witnesses "[t]hrough training and…[her] experiences as a forensic interviewer." She believed that her training on "reasons for disclosures" had been subjected to peer review, but she did not "know for sure." She did not know if Tom Lyons had written any articles regarding disclosure or if any articles had been subject to empirical testing. She did not know if there were any "general

30

reliable studies that support opinions about reasons a witness may or may not disclose child abuse in terms of timing."

Williams testified that she had received ongoing delayed disclosure training when she trained on the ChildFirst protocol and other protocols. She testified that based on her "experience of actually interviewing children," children often delayed their disclosures. She provided various reasons that might cause children to delay disclosure, and said that she had found those reasons to be true across interviews that she had actually performed.

Finally, Williams testified that she had not "reviewed or been a part of any studies or research regarding late disclosures." She could not "express an opinion as to why" Victim did not disclose the sexual abuse until May 2017 after the last act in November 2016, and that such opinion was "not subject to any peer review study."

Under section 490.065.2(1), "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) The testimony is based on sufficient facts or data;
>
> (c) The testimony is the product of reliable principles and methods; and
>
> (d) The expert has reliably applied the principles and methods to the facts of the case[.]

§ 490.065.2(1).

In this case, Williams did not offer an "opinion" about Victim's delayed disclosure, but testified "otherwise" about the process of disclosure and delayed disclosure as part of that process. The trial court did not abuse its discretion in permitting this testimony.

Williams had the education, training, and experience of a forensic interviewer with more than eight years of practice. The plain language of section 490.065.2(1) contemplates that an expert may be qualified based solely on her training or experience. *State v. Loper*, 609 S.W.3d 725, 736 (Mo. banc 2020). Williams's "breadth and depth of experience qualified her to testify as an expert" about the process of disclosure, including delayed disclosure. *Id.* She had "specialized knowledge" that would help the jury to "to understand the evidence or to determine a fact in issue." § 490.065.2(1)(a).

Williams's testimony was also based on "sufficient facts or data" that she gleaned from her education, training on child-interview protocols, and personal experience in conducting more than 1900 forensic interviews. § 490.065.2(1)(b). "No one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Suttles*, 581 S.W.3d at 150 (internal quotes and citations omitted). "As long as an expert's testimony rests upon good grounds, based on what is known it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset." *Id.* (internal quotes and citations omitted). Here, Williams testified that delayed disclosure was part of the ChildFirst protocol training that she had received, and that she had found the various reasons for delayed disclosure to be true across interviews that she had actually performed.

Williams's testimony was also the "product of reliable principles and methods." § 490.065.2(1)(c). She testified that she had been trained over time on various interview protocols. She explained that the ChildFirst protocol was "research based" and that she believed it was peer reviewed. She used the ChildFirst protocol at the Child Protection Center and followed the protocol while interviewing Victim. In *Suttles*, the Eastern District noted that "delayed

32

disclosures by child-victims of sexual abuse [has] long-standing support in scientific literature and among experts." *Suttles*, 581 S.W.3d at 150 (citing *State v. J.L.G.*, 190 A.3d 442, 464 (N.J. 2018)). "Although the delayed-disclosures theory is not easily subject to peer review and/or publication under the *Daubert* factors, scientists generally accept the theory to explain a common behavior seen in child-victims of sexual abuse." *Id.* at 151. "As a theory, delayed disclosure testimony rests upon good grounds, based on what is known." *Id.* (internal quotes and citation omitted). [13]

Finally, Williams "reliably applied the principles and methods to the facts of the case." § 490.065.2(1)(d). She testified that she followed her training in interviewing Victim, and she offered only generalized testimony about the process of disclosure and delayed disclosure. Williams's testimony satisfied the requirements of section 490.065.2.

Gibbons finally asserts that Williams's particularized testimony on delayed disclosure usurped the authority of the jury. Gibbons seems to acknowledge that Williams gave "generalized" testimony, but asserts, "Given her work in this particular case, [her] testimony could only be viewed by the jury as particularized."

In child sexual abuse cases, two types of testimony are typically at the forefront of a challenge against an expert witness—generalized and particular. *Suttles*, 581 S.W.3d at 148. "General testimony describes behaviors and characteristics commonly found in victims. Particularized testimony concerns a specific victim's credibility as to the abuse." *Id.* (internal

---

[13] *See also State v. Marshall*, 596 S.W.3d 156 (Mo. App. W.D. 2020), where this court held that, when the expert does not offer particularized testimony or a specific opinion about the child sex-abuse victim but only generalized testimony based on specialized knowledge, a different analysis regarding reliability is appropriate. *Id*. at 161. Thus, certain *Daubert* factors (such as "the testing or replicability of [the expert's] analysis, the error rate of that analysis, or the standards and controls governing the application of that analysis") are not relevant. *Id.*

33

quotes and citations omitted). "Missouri courts have long recognized that generalized testimony about the behaviors of children alleging sexual abuse is specialized knowledge and it is helpful to juries." *Id.* (internal quotes and citation omitted).

Here, Williams offered generalized testimony in testifying about the process of disclosure. She did not offer an opinion about Victim's delay, and she did not opine on Victim's credibility. To the contrary, Williams expressly acknowledged that she was "not able to express an opinion as to why [the sexual abuse in November 2016] was not disclosed until May 2017." The mere fact that Williams interviewed Victim did not transform her generalized testimony in to particularized testimony. The trial court did not abuse its discretion in allowing Williams to provide expert testimony regarding delayed disclosures of sexually abused children.

Point five is denied.

### Admission of Victim's Out-of-Court Statements

In his sixth point on appeal, Gibbons contends that the trial court erred in admitting Victim's out-of-court statements to Eli Postlethwait, Tammy Kemp, Dana Plas, and Brandy Williams.[14] He argues that Victim's statements did not provide sufficient indicia of reliability due to her state of mind during her first statements, the training and qualifications of some the individuals to whom Victim made statements, Victim's distrust of the Children's Division, the taint that occurred prior to Victim's forensic interview, and the improper interview techniques used during the forensic interview.

---

[14] In the argument section of his brief, Gibbons claims that Victim's statements to Mother did not bear sufficient indicia of reliability. Gibbons, however, did not challenge those statements in his point relied on. "Claims of error that first appear in the argument portion of a brief but are not included in the point relied on are not preserved for review." *Bolden v. State*, 423 S.W.3d 803, 815 n.12 (Mo. App. E.D. 2013) (internal quotes and citation omitted).

Appellate review of the trial court's decision to admit testimony under section 491.075 is limited to whether the trial court abused its discretion. *State v. McClure*, 482 S.W.3d 504, 506 (Mo. App. W.D. 2016).

Section 491.075 governs the admissibility of out-of-court statements of child witnesses. *State v. Hawkins*, 604 S.W.3d 785, 790 (Mo. App. W.D. 2020). It provides, in pertinent part, that a child's otherwise inadmissible, out-of-court statement relating to an offense under Chapter 566 is admissible to prove the truth of the matter asserted if: "(1) The court finds, in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient indicia of reliability; and (2)(a) The child…testifies at the proceedings[.]" § 491.075.1, RSMo 2016. In order to determine whether a statement bears sufficient indicia of reliability, the totality of the circumstances must be examined. *State v. Johnstone*, 486 S.W.3d 424, 430 (Mo. App. W.D. 2016). In evaluating the totality of the circumstances, the following non-exclusive factors are considered: "(1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) the lack of motive to fabricate; and (4) knowledge of subject matter unexpected of a child of similar age." *Id.* (internal quotes and citations omitted). "The lapse of time between when the acts occurred and when the victim reported them is also a factor to consider." *State v. Wadlow*, 370 S.W.3d 315, 320 (Mo. App. S.D. 2012) (internal quotes and citation omitted). The technique employed by the interviewer may also be considered. *Id.* "The trial court decides whether or not to admit the victim's out-of-court statements based on the information provided at the [491] hearing." *Id.* (internal quotes and citation omitted).

Deputy Postlethwait testified at the 491 hearing that he went to Victim's house on May 14, 2017, in response to a report of a suicidal person. He stated that Victim was "visibly upset"

35

and that she was not comfortable talking in front of her parents. He talked to Victim in the front yard, and she referred to a "situation" and kept saying that she "didn't want 'it' to happen" and she "didn't want 'it' to happen to her younger sister." She said that the last time "it" had occurred was in November 2016 and that a male person in the residence had done "it."

The deputy testified that he asked Victim limited questions "to get a picture what [he] was dealing with." He said that he "was not asking interrogative type questions" because Victim "was a young girl who may not feel comfortable talking to a grown adult male about something sensitive." He took "a more compassionate approach versus an interrogative approach" and "engaged her in conversation" without "actively…trying to tear [her] down to get whatever she had." He said that his "goal there was to get her a proper level of care" and not subject her "to more interviews of the same thing."

The trial court did not err in finding that Victim's statements to Deputy Postlethwait bore sufficient indicia of reliability. The evidence supported an inference that Victim spontaneously reported, without coercion or suggestion, that a male in the house had done "it" to her. No evidence was presented that the deputy was aware of any allegations of sexual abuse when he questioned Victim, and it was Victim who stated that she was not comfortable talking in front of her parents. Deputy Postlethwait did not use interrogation tactics, but only briefly questioned Victim, without trying to elicit details, to get her proper care and treatment. Victim's use of the vague term "it" to refer to sexual activity and her reluctance to provide details was consistent with a spontaneous disclosure by a child who was not comfortable discussing sexual matters with an adult stranger. Her troubled state of mind and suicidal ideations tended to show that she had suffered traumatic experiences. Additionally, there was no evidence that Victim had a motive to fabricate her allegation, and her statement that the last time "it" happened was in November 2016

36

was consistent with subsequent disclosures. Considering the content and circumstances of Victim's statement to the deputy, the trial court did not abuse its discretion in determining that Victim's statements to Deputy Postlethwait bore a sufficient indicia of reliability.

Tammy Kemp testified at the 491 hearing that she was a medical social worker at Children's Mercy Hospital. She testified about her education and licenses, and that she had received specialized training on how to interview children. She explained that, at the hospital, they tried to minimize interviews of children and that the purpose of an interview was to obtain information "to guide the medical exam or tell us what kind of reporting we need to do." She said that she was trained on leading versus nonleading questions, and that she tried to ask nonleading questions.

Kemp testified that Victim told her that "her father was touching her in places that she didn't want to be touched." Victim said that the last incident of touching had occurred in November 2016. Victim told her that it had happened "at least ten times since she was 11 years old." Victim said that her mother "was aware of five instances," and that she had told her older brother. Kemp testified that Victim told her that she asked her dad to stop, told him no, and asked him to leave.

The trial court did not err in finding that Victim's statements to Kemp bore sufficient indicia of reliability. The evidence supported an inference that Victim spontaneously reported that her father had touched her "in places that she didn't want to be touched." Kemp was trained in interviewing children and leading versus nonleading questions. There was no evidence that she led Victim to make the general disclosure, and she did not press Victim for details. Finally, Victim's disclosure about the last incident occurring in November 2016 was consistent with what she told Deputy Postlethwaite immediately prior to going to the hospital. The trial court did not

37

abuse its discretion in concluding that the content and circumstances of Victim's statement to Kemp provided sufficient indicia of reliability.

Dana Plas testified at the 491 hearing that she was employed by the Jackson County Children's Division. She testified about her education, and she stated that she received "[e]xtensive training on interviewing techniques and building rapport with children," and had conducted numerous interviews of children.

Dana Plas testified that, when she met with Victim on May 27, 2017, Victim was "very standoffish" and "didn't want to speak with [her]." Victim believed that the Children's Division had lied about the investigation in the case in which she was removed from her biological family. Plas testified that she explained to Victim that she was there just to make sure Victim was okay and safe. Victim said that "she felt safe in the home with her mother, as long as Michael Gibbons was not there." She said that Gibbons had "touched her in places that made her feel uncomfortable." Plas testified that she did not elicit "a lot of details" because she was there to conduct a "cursory interview."

The trial court did not err in finding that Victim's statements to Plas bore sufficient indicia of reliability. The evidence supported an inference that Victim spontaneously reported that her father had "touched her in places that made her feel uncomfortable." Plas was trained in interviewing children, and there was no evidence that she led Victim to make the general disclosure of touching. To the contrary, Plas conducted only a cursory interview and did not pressure Victim for details. Victim's disclosure was also consistent with the general disclosure she made at the hospital about two weeks earlier. The trial court did not abuse its discretion in determining that content and circumstances of Victim's statement to Plas provided sufficient indicia of reliability for their admission at trial.

38

Brandy Williams testified at the 491 hearing that she had extensive education, training, and experience in conducting forensic interviews. She stated that she had conducted more than 1,900 forensic interviews and that she had been using the ChildFirst protocol since 2014. She explained that the protocol allows interviewers to use open-ended questions "to get a narrative from the child." She said that "[t]he open-ended questions then often lead to more direct questions trying to get overall information and details about what else is occurring."

The video recording of the forensic interview of Victim was admitted into evidence, and Williams testified about the interview. She said that Victim's leg was shaking during the interview and that Victim "cried a little bit throughout the interview." Williams outlined various disclosures that Victim had made, and said that Victim had referred to her "private parts" and had pointed "to a general area of her chest and then also to her vagina."

The trial court did not abuse its discretion in finding that Victim's statements to Williams bore sufficient indicia of reliability. The evidence supported an inference that Victim spontaneously reported the additional details about the sexual activity. Williams was trained in interview protocols, including the use of non-leading questions, which were sometimes followed by more direct questions to clarify the child's disclosures. There was no evidence that Williams improperly led Victim to make new disclosures. Gibbons argues that "'forced choice' or leading questions occurred multiple times" during the forensic interview.[15] He does not, however, identify any particular questions or instances. Furthermore, as noted in footnote 4 above, Gibbons failed to include the exhibit containing the forensic interview in this record on appeal.

---

[15] Williams testified at trial that a "forced choice or funneling" question presents the child with options, including an "opt out" option that permits the child to give a response that is not included among the other definite options. She further testified that forced choice or funneling questions are not considered leading questions.

Its contents are, therefore, taken as favorable to the trial court's ruling and unfavorable to Gibbons. *Johnson*, 372 S.W.3d at 553 n.1.

Additionally, Victim's more detailed disclosures about the various incidents were consistent with her earlier, general disclosures that Gibbons touched her in a manner she did not want and that made her uncomfortable. Victim also consistently disclosed that the last incident had occurred in November 2016. To the extent that Victim did not consistently state the number of times that Gibbons touched her, "inconsistencies or contradictions in statements by young children relating to sexual experience do not, by themselves, deprive the statements of all probative force." *State v. Sprinkle*, 122 S.W.3d 652, 663 (Mo. App. W.D. 2003). "[I]n cases involving such young victims and sensitive and embarrassing subject matters, it is common for the testimony of a victim of tender years to contain some variations, contradictions or lapses in memory." *Id.* (internal quotes and citation).

Finally, there was no evidence that Victim had a motive to fabricate. Her demeanor showed that she had, in fact, been traumatized. The trial court did not err in determining that the content and circumstances of Victim's statement to Williams provided sufficient indicia of reliability.

The trial court did not abuse its discretion in admitting Victim's out-of-court statements to Eli Postlethwaite, Tammy Kemp, Dana Plas, and Brandy Williams. Even if the statements were erroneously admitted, which we do not find, Gibbons was not prejudiced. "If hearsay testimony is erroneously admitted, the admission does not require reversal unless the defendant was prejudiced as a result." *State v. Tindle*, 395 S.W.3d 56, 63 (Mo. App. S.D. 2013). "A defendant is not prejudiced by hearsay testimony that is merely cumulative of evidence already before the trial court, especially if that evidence was presented by another witness who was

subject to cross-examination." *Id.* (internal quotes and citation omitted). "Indeed, prejudice will not be found from the admission of hearsay testimony where the declarant was also a witness at trial, testified on the same matter, and was subject to cross-examination because the primary defects in hearsay testimony are alleviated." *Id.* (internal quotes and citation omitted). Here, because Victim was a witness at trial, testified on the same matters, and was subject to cross-examination about her various statements, Gibbons was not prejudiced. *Id.*; *McClure*, 482 S.W.3d at 507-08.

Point six is denied.

## Improper Bolstering

In his seventh point on appeal, Gibbons contends that the trial court erred in overruling his objections to the prosecutor's questioning Victim about prior statements that she gave and her motive for testifying. He argues that the line of questioning allowed the prosecutor to improperly bolster Victim's testimony and to imply that she was a trustworthy and credible witness before she had been impeached.

During direct examination of Victim, the prosecutor elicited that Victim had made only limited disclosures to her mother and brother and two friends before she disclosed the sexual abuse to a law enforcement officer. Victim testified that she had not been comfortable telling anyone else before those limited disclosures. The prosecutor then asked, "How many people do you think that you had to talk to about being abused by Mr. Gibbons [since the disclosure to the law enforcement]?" Defense counsel objected to the prosecutor's question, arguing that the prosecutor was attempting to bolster Victim's credibility. The prosecutor responded that Victim's answer would explain her demeanor on the stand and "some of the inconsistent statements because of the amount of statements that she had to give." The trial court overruled

41

the objection. Victim then testified that she had been required to give statements to the prosecutor, defense counsel, the forensic interviewer, her mother, someone from the hospital, and someone from Children's Division.

The prosecutor then asked how it made Victim feel to have to talk to so many people about the sexual abuse, and Victim said that she felt "ashamed like it's my fault." The prosecutor asked, "The things that you're telling us today why are you telling them to us?" Over a bolstering objection, Victim testified, "Because I don't want it to happen to another little girl." She also testified that she had no reason "to make these things up against" Gibbons and that she would not "make these things up against" him.

The trial court has broad discretion in determining the admissibility of evidence, and its ruling will not be disturbed on appeal absent a clear abuse of that discretion. *State v. Edwards*, 537 S.W.3d 848, 852 (Mo. App. E.D. 2017). "Improper bolstering occurs when the out of court statement of a witness is offered solely to be duplicative or corroborative of trial testimony." *State v. McFadden*, 391 S.W.3d 408, 430 (Mo. banc 2013) (internal quotes and citations omitted). "If a prior consistent statement is relevant for purposes other than corroboration and duplication of trial testimony, it is not improper bolstering." *Edwards*, 537 S.W.3d at 854.

Moreover, "[w]here an attorney recognizes a possible basis for impeachment of his witness, he is entitled to have that witness explain or state the facts regarding that basis, instead of having to stand by until the impeachment material is dramatically revealed by his adversary." *State v. Vik*, 766 S.W.2d 641, 644 (Mo. App. S.D. 1989). *See also Tramble v. State*, 414 S.W.3d 571, 575 (Mo. App. E.D. 2013) ("[T]he state may anticipate a possible basis for impeachment and demonstrate it on direct examination.") Such trial strategy is common, accepted practice in criminal cases, e.g., defense counsel exposes on direct examination past criminal convictions of

his witness or a prosecutor exposes on direct examination the terms of his accomplice witness's plea bargain. *Id.*

The prosecutor did not improperly bolster Victim's testimony in questioning her about prior statements that she gave and her motive for testifying. The fact that Victim made several statements to several people was not offered solely to be duplicative or corroborative of her trial testimony. The timing and reasons for Victim's various statements in relation to prior disclosures (and failures to disclose) were relevant to Victim's credibility. Furthermore, the prosecutor explained that it was offered to explain her demeanor at trial and some of her prior inconsistent statements.

In this case, defense counsel's opening statement showed the defense's intent to use Victim's failure to disclose and her various different statements to attack Victim's credibility. For example, counsel summarized Victim's first disclosure to her mother and then stated, "We ask you to pay careful attention to the accounts by [Victim] each time she describes the story." Counsel also intimated that Victim's allegations were a product of unfortunate personal circumstances related to her adoption, which caused "acting out, tantrums, having issues of mental concern," and "depression." The defense sought to portray Victim as untruthful in light of her various statements and motivated to make up allegations in light of her troubled circumstances. The prosecutor's anticipation of impeachment of Victim and attempt to minimize its damaging impact on her credibility by having Victim explain it on direct examination was proper. *Id.* The trial court did not abuse its discretion in permitting Victim's testimony.

Point seven is denied.

43

## Sufficiency of the Evidence

In point eight, Gibbons contends that the evidence was insufficient to support his convictions on Counts I, II, III, and IV for statutory sodomy in the first degree and child molestation in the first degree. He asserts that the convictions were based solely on Victim's testimony, which was not credible because it was inconsistent and uncorroborated.

Appellate review of the sufficiency of the evidence to support a criminal conviction is limited to determining whether there is sufficient evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *State v. Porter*, 439 S.W.3d 208, 211 (Mo. banc 2014). "All evidence and inferences favorable to the State are accepted as true, and all evidence and inferences to the contrary are rejected." *Id.*

Gibbons does not make any specific argument regarding the sufficiency of the evidence as to any count. Rather, he argues that "[n]o reasonable juror could have found [him] guilty beyond a reasonable doubt of Counts I, II, III and IV as there is no physical evidence to support [Victim's] claims of sexual abuse." He also asserts that "there were no witnesses to the alleged abuse to support [Victim's] allegations" and that "[Victim's] statements of alleged abuse were inconsistent." Gibbons's arguments are, however, contrary to the standard of review, which requires the reviewing court to disregard all evidence and inferences that are contrary to the verdict. *Id.* "[T]he trier of fact is generally in the best position to resolve inconsistent testimony by the child victim of a sex crime." *Id.* at 214.

Furthermore, Gibbons acknowledges that the Missouri Supreme Court abolished the corroboration rule and destructive contradictions doctrine in *Porter*, but argues that *Porter* was decided incorrectly and asks this court to reinstate both. This court, however, is bound to follow

the last controlling decision of the Missouri Supreme Court. *State v. Norman*, 618 S.W.3d 570, 579 (Mo. App. W.D. 2020).

The evidence was sufficient to support Gibbons's convictions. Counts I and II charged Gibbons with first-degree statutory sodomy. "A person commits the crime of statutory sodomy in the first degree if he has deviate sexual intercourse with another person who is less than fourteen years of age." § 566.062.1, RSMo Supp. 2014. "Deviate sexual intercourse" is defined, in pertinent part, as "any act involving the genitals of one person and the hand…of another person or a sexual act involving the penetration, however slight, of the…female sex organ…by a finger…done for the purpose of arousing or gratifying the sexual desire of any person[.]" § 566.010(1), RSMo Supp. 2014.

Victim testified that after she was adopted when she was nine years old, Gibbons started touching her. She said that when she was ten or eleven years old, he started touching her vagina. The touching started over her clothing, but then progressed to under the clothes. She said that when he touched her vagina under the clothes, he would touch her on the "inside." She further testified that when she was eleven or twelve years old, Gibbons "started putting his fingers inside [her]." By this time, the touching was occurring once or twice a week. From this evidence, reasonable jurors could have found that Gibbons put his finger inside Victim's vagina during the time period of July 31, 2012 (Victim's ninth birthday), to July 30, 2015 (the day before Victim's twelfth birthday), in order to find him guilty of first-degree statutory sodomy in Count I.

Victim further testified that in November 2016, Gibbons touched her in her bedroom. On that occasion, she was texting her friends when he came into her room and "started doing what he normally did." She said that he touched her breasts and the inside of her vagina. From this

45

evidence, reasonable jurors could have found that Gibbons put his finger inside Victim's vagina in November 2016, in order to find him guilty of first-degree statutory sodomy in Count II.

Counts III and IV charged Gibbons with first-degree child molestation. "A person commits the crime of child molestation in the first degree if he or she subjects another person who is less than fourteen years of age to sexual contact." § 566.067.1, RSMo Supp. 2014. "Sexual contact" is defined, in pertinent part, as "any touching of another person with the genitals or any touching of the genitals…of another person,…or such touching through the clothing, for the purpose of arousing or gratifying sexual desire of any person[.]" § 566.010(3), RSMo Supp. 2014.

Victim testified that around July, when she was eleven years old,[16] Gibbons made her touch his penis area on the outside of his clothes. She said that Gibbons would start touching her and then he would take her hand and put it where he wanted "in his pants area." He would make her "rub against it" and that his penis was hard. From this evidence, reasonable jurors could have found that Gibbons made Victim touch his penis through his clothing during the time period of July 1, 2015, to July 30, 2015 (the day before Victim's twelfth birthday), in order to find him guilty of first-degree child-molestation in Count III.

Finally, Victim testified that, on one occasion when she was twelve years old and her mother was out, Gibbons was in her bedroom touching her and then he made her touch his penis. In her forensic interview, Victim stated that she was twelve years old the last time Gibbons made her touch his "private part."[17] From this evidence, reasonable jurors could have found that

---

[16] Victim turned eleven on July 31, 2014. She would have been eleven years old in July 2015, until she turned twelve on July 31, 2015.

[17] Again, Gibbons does not challenge this statement in the State's brief regarding Victim's statement in the forensic

46

Gibbons made Victim touch his penis through his clothing during the charged time period of July 31, 2015, (Victim's twelfth birthday) to July 30, 2016 (the day before Victim's thirteenth birthday), in order to find him guilty of first-degree child molestation in Count IV.

There was sufficient evidence from which a reasonable jury could have found Gibbons guilty beyond a reasonable doubt on all four counts. *Porter*, 439 S.W.3d at 211.

Point eight is denied.

## Closing Argument

In his ninth and final point on appeal, Gibbons contends that the trial court erred in overruling his objection to the prosecutor's closing argument that according to the State's expert, Brandy Williams, Victim's testimony was consistent and believable. He asserts that such argument violated Missouri's prohibition against particularized testimony in sexual abuse cases and resulted in improper vouching and bolstering of Victim.

"The trial court has broad discretion in controlling the scope of closing arguments." *State v. Swalve*, 598 S.W.3d 682, 689 (Mo. App. S.D. 2020) (internal quotes and citation omitted). The State is permitted to argue the evidence and all reasonable inferences therefrom. *Id.* While the State has wide latitude in closing argument, the trial court should exclude statements that misrepresent the evidence or the law, that introduce irrelevant, prejudicial matters, or that otherwise tend to confuse the jury. *Id*. at 689-90. Review of alleged error during closing argument is for abuse of discretion. *Id.* at 689.

---

interview. As noted in footnote 4 above, Gibbons failed to include the exhibit containing the forensic interview in this record on appeal. Its contents, including this statement by Victim during the interview, are therefore taken as favorable to the trial court's ruling and unfavorable to Gibbons. *Johnson*, 372 S.W.3d at 553 n.1.

On rebuttal, the prosecutor argued, "Brandy Williams is an expert and that is her life's passion to do this kind of work. And that she gave you lots of different reasons why [Victim's] testimony is consistent and why [Victim's] testimony is believable." Defense counsel objected, stating that the prosecutor had misstated the evidence. Defense counsel pointed out that Williams has stated that her purpose was not to determine credibility or truthfulness. The prosecutor responded that she was arguing the inferences to draw from Williams's testimony and that she would clarify that. The trial court overruled the objection "with that clarification." Argument resumed, and the prosecutor clarified her argument, "Brandy Williams gave you a list of things about why children sometimes make inconsistent statements. So you can draw conclusions from those things that she described to you, and conclude that [Victim's] testimony is, in fact, reasonable and credible."

Williams testified generally about the process of disclosure and delayed disclosure by child victims of sexual abuse and how the process and delay might produce varying statements by children. She did not offer an opinion as on Victim's delayed disclosure and did not opine on Victim's credibility. The prosecutor argued that the jury should consider William's generalized testimony and draw inferences from that testimony about Victim's credibility. "The State may make reasonable inferences from the evidence and may argue the credibility of witnesses, as long as the prosecutor bases the arguments on evidence presented at trial." *State v. Crowe*, 128 S.W.3d 596, 600 (Mo. App. W.D. 2004). The prosecutor's argument was based on the evidence presented at trial and was proper. The trial court did not abuse its discretion in overruling Gibbons's objection to it.

Point nine is denied.

**Conclusion**

The convictions are affirmed.

_____
Thomas N. Chapman, Judge

All concur